**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>**Plaintiff,**<br>v.<br>[1] STANISLAV GUTKIN,<br>[2] LAWRENCE GERMAN, and<br>[3] VLADISLAV GERMAN,<br>**Defendants.** | **CRIM. NO. 23-7 (RAM)** |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is the *Emergency Motion to Suppress and Request for Evidentiary Hearing* ("*Motion*") filed by Defendants Stanislav Gutkin ("Gutkin") and Lawrence German and joined by Defendant Vladislav German (collectively "Defendants"). (Docket No. 80). Having reviewed the United States of America's (the "Government") *Response*, the *Reply* filed by Gutkin and Lawrence German, and the Government's *Sur-reply*, (Docket Nos. 91, 114, and 117, respectively), the Court **DENIES** Defendants' *Motion*.

## I. FACTUAL BACKGROUND[1]

On August 23, 2019,[2] a confidential human source ("CHS") provided information to Federal Bureau of Investigation ("FBI")

[1] The facts in this section are derived from the *Motion*, responsive pleadings, and their exhibits.

[2] Although the Defendants asserted that the CHS provided the thumb drive on or about August 22, 2019, the Government clarified in its *Sur-reply* that the correct date was actually August 23, 2019. (Docket No. 117 at 4 n.2).

agents regarding the operations of CCM Health LLC (referred to along with the related entity CCM Health, Inc. as "CCM Health").[3] (Docket No. 82-2 at 5). On that same date, the CHS also provided the FBI with a thumb drive. Id. at 6. The CHS is an employee of CCM Health LLC. (Docket No. 91 at 3). According to Defendants, the CHS began working at CCM Health LLC a few months before meeting with the FBI on August 22, 2019. (Docket No. 80 at 4). At that time, the CHS signed a non-disclosure agreement and agreed to abide by a code of conduct requiring the CHS to keep CCM Health information confidential. Id. The CHS's first meeting with the FBI took place on August 2, 2019. (Docket No. 117 at 5).

Four days after turning over the thumb drive,[4] the CHS called the FBI and stated that the drive contained copies of emails, WhatsApp conversations, pictures, phone records, phone videos, and downloaded care plans, all of which were related to CCM Health or Gutkin. (Docket Nos. 82-3 at 1 and 91 at 3). Subsequently, the Government applied for a search warrant to examine the contents of

[3] CCM Health LLC is a Puerto Rico corporation organized on or about April 3, 2019. (Docket No. 93-1 at 1-3). Its sole member is Lawrence German. Id. at 4. CCM Health, Inc. is a New York corporation that was incorporated by Gutkin in December 2017. (Docket No. 82-2 at 6). At times, the parties do not specify whether CCM Health refers to the Puerto Rican entity or the New York entity. The Court adopts the nomenclature used by the parties.

[4] The Government noted in its *Response* that this communication took place on August 28, 2019, but a footnote and the underlying FBI report indicate that the date of the contact itself was instead August 26, 2019. (Docket Nos. 82-3 at 1 and 91 at 3 n.2).

the thumb drive, which was authorized on September 10, 2019. (Docket No. 82-2). This search warrant was the only one executed in this case. (Docket No. 91 at 3 n.4). An FBI report written after the execution of the search warrant noted that the thumb drive contained a backup of the CHS's work computer from August 16, 2019, as well as the aforementioned WhatsApp conversations. (Docket No. 82-3 at 8).

On October 21, 2019, the CHS downloaded another copy of his or her desktop computer at CCM Health. (Docket No. 82-3 at 10). Moreover, an FBI report dated December 9, 2019, notes that the CHS provided a compact disc with a full back-up of the CHS's work computer as well as WhatsApp messages. (Docket No. 82-3 at 11). The compact disc also contained a file documenting patient log information. Id.

## II. PROCEDURAL BACKGROUND

On January 11, 2023, the Grand Jury returned an 122-count Indictment charging Defendants with health care fraud, in violation of 18 U.S.C. § 1347 (Counts 1 through 120), and conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Counts 121 and 122). (Docket No. 3). Mr. Gutkin is charged in all counts of the Indictment, Mr. Lawrence German is charged in Counts 1-90 and 121, and Mr. Vladislav German is charged in Counts 91-120 and 122. Id.

On August 14, 2023, attorneys for the Defendants and the Government met and conferred regarding pretrial evidentiary issues. (Docket No. 75 at 1). During that meeting, the Government gave Mr. Gutkin's attorney three identical sets of compact discs containing the materials collected by the CHS and provided to the FBI. Id. The Government also stated that it was still in the midst of reviewing the emails and WhatsApp messages provided by the CHS for attorney-client privileged materials. Id. Because the Government believed that any privileged materials would concern the relationship between corporate counsel for CCM Health, Inc. and Mr. Gutkin, the attorneys for Messrs. Lawrence and Vladislav German were not provided with the compact discs. Id. at 2. Instead, the Government suggested that Mr. Gutkin could share copies of the potentially privileged materials with his co-defendants if he so chose. Id.

On August 17, 2023, Mr. Gutkin and Mr. Lawrence German filed the *Motion*. (Docket No. 80). On August 23, 2023, Mr. Vladislav German moved to join the *Motion*. (Docket No. 89). The Defendants moved to suppress all documents obtained from the CHS, to hold an evidentiary hearing regarding the seized documents, and for an order barring the Government from any further review of potentially privileged materials. (Docket No. 80 at 3). In support of the *Motion*, Defendants argue that the Government improperly enlisted

the CHS to search for and seize documents in violation of the Fourth Amendment. Id. at 11. Additionally, they contend that the Government interfered with the Defendants' relationship with their attorneys in violation of their Fifth Amendment right to due process and Sixth Amendment right to counsel. Id. at 11-13.

The Government subsequently filed its *Response* on August 23, 2023, arguing that the *Motion* was insufficiently specific, and that Defendants failed to establish they had a reasonable expectation of privacy in the evidence obtained via the CHS. (Docket No. 91). Additionally, the Government contends that Defendants cannot assert that their individual attorney-client privileges were implicated because the files provided by the CHS only include communications with corporate counsel. Id. at 10-14.

On August 28, 2023, the Court held a status conference to evaluate the Government's review of potentially privileged materials. (Docket No. 98). After inspecting the Government's filter team instructions,[5] the Court ruled that the taint review could proceed so long as it integrated keywords provided by the Defendants. (Docket No. 99). Additionally, at the conference,

[5] A filter team (also known as a taint team) is used to review potentially privileged (or tainted) attorney-client materials that are segregated from a larger set of documents, and the processes by which the filter team is selected and reviews the documents is sometimes referred to as a filter protocol. *See* United States v. Snyder, 71 F.4th 555, 566-69 (7th Cir. 2023) (discussing cases involving filter teams).

defense counsel for Mr. Gutkin provided the other two co-defendants with the compact discs containing materials produced by the CHS. (Docket No. 98). Regarding their *Motion*, Messrs. Gutkin and Lawrence German soon filed a *Reply* on September 26, 2023, (Docket No. 114),[6] and the Government answered with its *Sur-reply* on October 3, 2023. (Docket No. 117).

Finally, on December 6, 2023, the Government submitted a memorandum summarizing the results of the filter review. (Docket No. 131-1). The filter attorney concluded there were eighteen potentially privileged documents in the materials provided by the CHS and stated those files would be kept segregated from the prosecution or investigative team. Id.

## III. ANALYSIS

### A. Fourth Amendment

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). The person claiming the protection of the Fourth

[6] The *Reply* was not filed on behalf of Mr. Vladislav German, but for ease of analysis and because he joined the underlying *Motion*, the Court nonetheless imputes its arguments to all the Defendants.

Amendment must demonstrate a legitimate expectation of privacy in the area searched or the item seized. Rakas v. Illinois, 439 U.S. 128, 143 (1978). The burden of establishing this expectation of privacy is often referred to as Fourth Amendment standing,[7] and it is a burden that falls squarely on the defendant. Rawlings v. Kentucky, 448 U.S. 98, 105 (1980). "[T]he defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). Until the defendant does so, whether a violation of the Fourth Amendment occurred is not legitimately in issue. United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

In Aguirre, the First Circuit laid out the factors relevant to the threshold question of standing: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856-57. Courts also "take notice of the position of

[7] Although the threshold question of whether a defendant can demonstrate a legitimate expectation of privacy is best considered through the framework of substantive Fourth Amendment law, courts sometimes refer to this inquiry as a form of standing analysis. United States v. Stokes, 829 F.3d 47, 51 n.7 (1st Cir. 2016) (citations omitted).

authority held by the party asserting his/her [F]ourth [A]mendment rights." Mancini, 8 F.3d at 109 (citing United States v. Brien, 617 F.2d 299, 306 (1st Cir. 1980)). However, "[n]o single factor determines whether an individual" has an expectation of privacy protected by the Fourth Amendment. Oliver v. United States, 466 U.S. 170, 177 (1984).

In this case, Defendants seek to suppress "all information" provided by the CHS and define the Fourth Amendment invasion as the "theft of documents from their businesses." (Docket No. 80 at 3, 9). By contrast, the Government assesses the Defendants' privacy interest vis-à-vis each category of item turned over to the FBI by the CHS: consensual audio and video recordings, emails and WhatsApp messages that the CHS sent and received, and business records. (Docket No. 91).[8] These arguments can be summarized as whether Defendants, two of whom are corporate officers or owners, may assert a privacy interest in the **areas searched** at and **objects seized** from CCM Health. The Court addresses these categories in turn. Because Defendants have not met their burden to demonstrate

[8] Defendants do not, *per se*, need to categorize the evidence they seek to suppress. *Contra* United States v. Cintron, 724 F.3d 32 (1st Cir. 2013) (holding that a defendant must allege specific facts to obtain an evidentiary hearing on a motion to suppress). However, doing so may nevertheless be helpful because "[j]udges are not obliged to do a movant's homework, searching *sua sponte* for issues that may be lurking in the penumbra of the motion papers." United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992).

a legitimate expectation of privacy as to either category, however, they cannot assert a Fourth Amendment violation.

i. Areas Searched

Corporate officers may not automatically assume the Fourth Amendment privileges of a corporation, even when the officer is the sole shareholder. *See* United States v. Britt, 508 F.2d 1052, 1055 (5th Cir. 1975), *cert. denied*, 424 U.S. 825 (1975). Furthermore, "business premises invite lesser privacy expectations than do residences." Vega-Rodriguez v. Puerto Rico Telephone Co., 110 F.3d 174, 178 (1st Cir. 1997). In some cases, "a corporate officer or employee may assert a reasonable expectation of privacy in his/her corporate offices even if shared with others[] and may have standing with respect to searches of corporate premises and records." United States v. Mancini, 8 F.3d 104, 109 (1st Cir. 1993) (citing Mancusi v. DeForte, 392 U.S. 364, 369 (1968)). To do so, however, the defendant must establish a **nexus** between the searched area and his own workspace or office. United States v. Chuang, 897 F.2d 646, 649-50 (2d Cir. 1990) (citing Britt, 508 F.2d at 1056).[9]

[9] Britt stands for the proposition that the officer of a **corporation** does not have Fourth Amendment standing with respect to seized corporate records by dint of the fact that he is a corporate officer. Citing Britt, several district courts have held officers of **limited liability corporations** ("LLCs") must similarly demonstrate a particular privacy interest in or nexus to the object of a challenged search or seizure. *See, e.g.*, United States v. Johnson, 2021 WL 4098611, at *7 (W.D. La. 2021), *R. & R. adopted*, 2021 WL 4097141 (W.D. La. 2021) (the owner/operator and business manager of a LLC lacked standing to challenge seizure of records from areas other than their personal offices); United States

Alternatively, the defendant ought to show at least some privacy interest in the seized evidence, such as ownership, possession, or physical presence. *See* United States v. Horowitz, 806 F.2d 1222, 1225 (4th Cir. 1986) (finding no standing when defendant was rarely present at office location and was "hundreds of miles away when the search and seizure took place").

Defendants here have not met their burden to establish a nexus to, or privacy interest in, the CCM Health office in Puerto Rico. In support of their *Motion*, they attached FBI reports that, rather than emphasizing Defendants' connection with the office, instead make clear that Mr. Gutkin did not have a bank account in Puerto Rico, that Mr. Lawrence German appeared to be the CEO of CCM Health in Puerto Rico only on paper, and that Mr. Gutkin and Mr. Vladislav German at times communicated with the CHS via video conference rather than in-person in Puerto Rico. (Docket Nos. 82-3 at 11 and 82-4 at 3). Further, Defendants have submitted no information that suggests, for example, that they kept personal items at CCM Health's office in San Juan, or even that they maintained exclusive office space there. *Cf.* Mancini, 8 F.3d at 110 (establishing expectation of privacy in secured attic above building where defendant worked, in which he had stored personal belongings);

v. Mendlowitz, 2019 WL 1017533, at *5 (S.D.N.Y. 2019) (same, as to LLC president and CEO).

Chuang, 897 F.2d at 650 (noting potential for employee-owner's legitimate expectation of privacy in his own office but not others'); United States v. Anderson, 154 F.3d 1225, 1229-30 (10th Cir. 1998) (collecting cases regarding nexus between employee-defendant and office area searched).

Messrs. Gutkin and Lawrence German's strongest argument in favor of standing is that they are the President of CCM Health, Inc. and the sole member of CCM Health LLC, respectively; Mr. Vladislav German has no such ownership claim. However, ownership alone is insufficient to establish standing. *See* United States v. García-Rosa, 876 F.2d 209, 219-20 (1st Cir. 1989) (discussing defendant's burden and finding no standing because defendant failed to claim a possessory interest), *vacated on different grounds sub. nom.* Rivera-Feliciano v. United States, 498 U.S. 954 (1990); United States v. Nagle, 803 F.3d 167, 176-77 (3d Cir. 2015) (referencing a "consensus among the Courts of Appeals that a corporate shareholder has a legitimate expectation in corporate property only if the shareholder demonstrates a personal expectation of privacy in the areas searched **independent of his status as a shareholder**"); United States v. McCullough, 2012 WL 11799871, at *6 (N.D. Ga. 2012), *R. & R. adopted*, 2014 WL 3955556 (N.D. Ga. 2014) (noting defendant who was the sole registered agent

of an LLC "must provide additional evidence" beyond his ownership interest to establish standing). !

Additionally, the cases relied on by the Defendants to establish standing are inapposite. For example, United States v. Cardona-Sandoval conveyed standing on a ship's captain, but his privacy interest was established through the unique position of being in charge of a vessel and through admiralty law doctrines, neither of which are applicable here. 6 F.3d 15, 21 (1st Cir. 1993). Silverthorne Lumber Co. v. United States did not address the question of expectation of privacy and stands instead for the propositions that corporations have Fourth Amendment rights, and that the government may not use evidence obtained illegally from an entity to subpoena that same entity. 251 U.S. 385, 491 (1920). In Mancusi, the parties stipulated that the movant spent "a considerable amount of time in the office, and that he had custody of the papers at the moment of their seizure," 392 U.S. at 368-69, while United States v. King relied heavily on the fact that the defendant was the owner of the property where the office was located. 212 F. Supp. 3d 1113, 1121 (W.D. Okla. 2015). No evidence of such a nexus to the business or property interest has been put forth by Defendants in this case.

ii. Objects Seized

Not only do Defendants fail to show a reasonable expectation of privacy in the CCM Health office generally, it is evident that they have no legitimate expectation of privacy in the seized electronic materials. This is clear from an analysis of each category of seized object. First, beginning with the audio-visual recordings created by the CHS, Defendants cannot assert standing because "conversations in the open" are not "protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Put plainly, the "Fourth Amendment does not protect an individual from having his or her conversation recorded with the consent of another person who is a party to the surveilled conversation." United States v. Diaz-Diaz, 433 F.3d 128, 133 (1st Cir. 2005) (citing Lopez v. United States, 373 U.S. 427, 438-39 (1963)); *see also* United States v. Miller, 720 F.2d 227, 228 (1st Cir. 1983) (holding that listening to or recording a conversation does not violate Fourth Amendment rights when one party to the conversation has consented).

Second, Defendants also cannot establish a privacy interest in the emails and WhatsApp messages turned over by the CHS. The Government avers that the CHS was a party to all the communications provided to the FBI, and Defendants do not argue otherwise. "[A]

person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," even when he believes the information "will be used only for a limited purpose." Carpenter v. United States, 138 S. Ct. 2206, 2216 (2018) (citations omitted). As applied to communications, then, a defendant has no expectation of privacy in internet transmissions or e-mails that have already reached the recipient. United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (citations omitted); *see also* United States v. Guzman Loera, 24 F.4th 144, 157-58 (2d Cir. 2022) (finding defendant who installed spyware on co-conspirators' phones had no expectation of privacy in messages that he sent to them and that were stored on an online server); United States v. Morel, 922 F.3d 1, 10 (1st Cir. 2019) (determining that uploading images to online album that could be accessed by third parties precluded defendant from claiming Fourth Amendment protection); United States v. Johnson, 2019 WL 917175, at *5-7 (D. Mass. 2019) (holding defendant who sent emails to third party could not challenge government's search of third party's email account).

Third, Defendants cannot assert a privacy interest in the corporate records. Although it is true that "shared access to a document does not prevent one from claiming Fourth Amendment protection in that document," Mancini, 8 F.3d at 108, a court must nonetheless consider what the document is and how it is

disseminated. *See* Morel, 922 F.3d at 10-11 (distinguishing Mancini by noting a single hard copy of an appointment calendar shared with persons who had a position of confidence is different from images uploaded to site that third parties could access). As such, there is "no reasonable expectation of privacy in corporate records maintained in a common file room." Williams v. Kunze, 806 F.2d 594, 600 (5th Cir. 1986); *see also* United States v. Mohney, 949 F.2d 1398, 1399, 1403 (6th Cir. 1991) (holding that sole owner of incorporated business had no standing where "the documents seized were normal corporate records not personally prepared by the defendant and not taken from his personal office, desk, or files, in a search that was not directed at him personally").[1]

In this case, the business records at issue appear to relate to CCM Health's electronic patient records system—a kind of common file room, albeit a virtual one. Based on a FBI report submitted by Defendants, it seems that CCM Health employees in Puerto Rico and Ukraine could access the care plans, further diminishing any privacy interest that Messrs. Gutkin, Lawrence German, or Vladislav German might have had in them. (Docket No. 82-3 at 8). Defendants argue that the electronic records were password-protected, and that the CHS was obliged to comply with both a non-disclosure agreement and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (Docket No. 80 at 2, 5).

However, there is no claim that these security measures were taken by Defendants in their personal capacities. Although CCM Health may have had a privacy interest in its business records, any efforts it took to secure those records "are relevant only to the standing of the corporation itself, not of its officers." United States v. SDI Future Health, Inc., 568 F.3d 684, 698 (9th Cir. 2009); *see also* Stewart v. Evans, 351 F.3d 1239, 1244 (D.C. Cir. 2003) ("The Fourth Amendment protects privacy; it does not constitutionalize non-disclosure agreements."); United States v. Novak, 2015 WL 720970, at *7 (N.D. Ill. 2015) (doubting that HIPAA regulations help an individual defendant establish subjective expectation of privacy in patient files seized from an office).

iii. Allegation that the CHS Was a Government Agent

Defendants also put forth arguments that a Fourth Amendment violation occurred because the CHS acted as an agent of the Government rather than a private individual.[10] (Docket No. 80 at 9-10). Because the Court has already determined that Defendants lack standing to challenge the search, it is unnecessary to address the issues of whether or when the CHS became an agent of the Government. *See* United States v. Melucci, 888 F.2d 200, 202 (1st

[10] The private search doctrine is implicated when a private party acts as "an instrument or agent of the Government," since in the "absence of governmental action, the Fourth Amendment does not apply." United States v. Mendez-de Jesus, 85 F.3d 1, 2-3 (1st Cir. 1996) (quotations omitted).

Cir. 1989) (declining to address remaining Fourth Amendment arguments once standing question was resolved).

In sum, because Defendants have no legitimate expectation of privacy in the evidence collected by the CHS, their motion to suppress on Fourth Amendment grounds is **DENIED.**

**B. Attorney-Client Privilege**

Defendants argue that because Government's use of the CHS interfered with their attorney-client relationships and therefore their Fifth Amendment right to effective assistance of counsel, the Court should order the taint review be paused until it can assess whether the review is proper. (Docket No. 80 at 11-13). At the August 28, 2023, status conference, the Court heard from the Government—including the Government's filter attorney—regarding the pending filter review. (Docket No. 98). The Government also provided the Court with its filter team protocol, which the Court reviewed and approved, with the addition of search terms supplied by the Defendants. (Docket No. 99). The Government then moved, unopposed, to conclude its filter review on October 4, 2023. (Docket No. 118). Finally, as of December 6, 2023, the filter review has ended, and potentially privileged material has been identified and segregated. (Docket No. 131). Since the primary remedy Defendants sought in their *Motion* was a pause in the filter review process, their request is **DENIED** as moot.

In their *Reply*, Defendants also moved the Court to hold an evidentiary hearing to determine if the Government relied on protocols other than the filter team process to safeguard potentially privileged information. (Docket No. 114 at 4). However, as discussed *infra* in Section III.D, no evidentiary hearing is warranted.

The Court further notes two important points. First, the "burden of proving the existence of the [attorney-client] privilege is on the party asserting the privilege." United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989). A "blanket assertion of privilege" is not sufficient "to show that the attorney-client privilege attaches[.]" In re Grand Jury Subpoena (Mr. S.), 662 F.3d 65 (1st Cir. 2011). In many cases, a privilege determination will require a "document by document" analysis. Id. As of August 28, 2023, all the Defendants are in possession of the compact discs containing the materials turned over by the CHS. (Docket No. 98). To the extent they believe that the Government has already viewed specific privileged information, Defendants may raise the issue in subsequent filings, but broad assertions of privilege without identifying specific documents will not be enough.

Second, the attorney-client privilege is a "testimonial privilege[.]" United States v. Zolin, 491 U.S. 554, 556 (1989).

"Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results." United States v. White, 970 F.2d 328, 336 (7th Cir. 1992). Because the Defendants make blanket claims of attorney-client privilege and do not identify a remedy for purported privilege violations, their arguments regarding the same are meritless.

**C. Disclosure of Evidence**

Defendants also request that the Court order the Government to produce material pursuant to Giglio v. United States, 405 U.S. 150 (1972), and the Jencks Act, codified at 18 U.S.C. § 3500. (Docket No. 80 at 13-14). The Court notes that counsel for Mr. Gutkin has already produced the compact discs containing materials from the CHS to Messrs. Lawrence and Vladislav German, so the issue of Government production is moot as to this evidence. As to any other Giglio material, which falls within the ambit of Brady v. Maryland, 373 U.S. 83 (1963), to the extent that the Government possesses any additional exculpatory information, it shall comply with its duty to promptly produce such evidence that Defendants do not yet have. *See* United States v. Montoya, 844 F.3d 63, 71 (1st Cir. 2016) (Brady material should be disclosed in a "timeous manner."). Defendants' request as to Jencks Act material is premature, because a court **may not** compel the early disclosure of such material prior to the conclusion of the direct testimony of

a Government witness. United States v. Grandmont, 680 F.2d 867, 874 (1st Cir. 1982). Accordingly, the motion to produce Giglio and Jencks Act material is **DENIED.**

**D. Evidentiary Hearing**

Defendants move for an evidentiary hearing, averring that such a hearing would expose the extent to which the CHS was a government agent. (Docket No. 80 at 14). In their *Reply*, the Defendants also add a new argument, seeking an evidentiary hearing to determine what filter protocols were put in place and to establish corporate officer standing. (Docket No. 114 at 4, 5). However, there is "no presumptive right to an evidentiary hearing on a motion to suppress." United States v. Cintron, 724 F.3d 32, 36 (1st Cir. 2013) (citations omitted). Generally, evidentiary hearings are only required "**if the movant makes a sufficient threshold showing that material facts are in doubt or dispute**, and that such facts cannot reliably be resolved on a paper record." Id. (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)) (emphasis added). "Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." Id.

Specifically, it is the defendant's burden to "allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to

enable the court to conclude that a substantial claim is presented.'" United States v. Calderón, 77 F..3d 6, 9 (1st Cir. 1996) (quoting United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994)). A court may choose not to hold an evidentiary hearing when a defendant offers no affidavits or other evidence in support of his motion to suppress. Calderón, 77 F.3d at 9. Defendants seeking an evidentiary hearing must do more than recite "conclusory, general allegations." United States v. Mitro, 880 F.2d 1480, 1484 (1st Cir. 1989).

In this case, Defendants submitted a search warrant, an accompanying affidavit, and several FBI reports as evidence that the CHS was the Government's agent. (Docket Nos. 82-1, 82-2, 82-3, and 82-4). However, none of these items place any material facts in issue. Rather, the disputes between the parties center on questions of law about standing and attorney-client privilege. Because these questions can be resolved on the paper record, Defendants cannot meet their burden to show why an evidentiary hearing is warranted. Furthermore, many of Defendants' assertions in support of an evidentiary hearing are conclusory and general, and therefore insufficient. For example, they claim that the FBI case agent had been "tainted" by viewing privileged documents without identifying any specific communications—even though the Defendants could examine the compact discs containing all the

materials at issue. (Docket No. 114 at 4). Accordingly, their *Motion* for an evidentiary hearing is **DENIED**.

**E. Timeliness**

Finally, Defendants object to the timing of the Government's disclosures and requests exclusion of evidence they argue is untimely disclosed. (Docket No. 80 at 14-15). The Government's discovery obligations are "broad" and "disclosures must be made in a timely manner." United States v. Kifwa, 868 F.3d 55, 60 (1st Cir. 2017) (citations omitted). The Defendants' original argument was premised on discovery that was still purportedly unproduced prior to a trial date of September 5, 2023. At the status conference, however, the parties mutually agreed to reset the trial, which is now scheduled for February 20, 2024. (Docket Nos. 98 and 122). Because Defendants do not allege that the Government failed to timely disclose in bad faith, "the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect." Kifwa, 868 F.3d at 60 (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990)). Given that Defendants will have had approximately six months to review the material in question by trial, they cannot make a showing of actual prejudice through delayed disclosure. *See* United States v. Royle, 2023 WL 7529207, at *6-7 (1st Cir. 2023) (finding no due process violation when there was a four-year delay

in notifying the defendant of a warrantless search of his residence prior to conducting a warrant-backed search, while nonetheless recognizing government's delayed disclosure was inopportune). Accordingly, Defendants' motion to exclude the materials produced by the CHS on timeliness grounds is **DENIED.**

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Defendants' *Emergency Motion to Suppress and Request for Evidentiary Hearing* is **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 19th day of December 2023.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE